45 So.3d 1277 (2010)
G.UB.MK CONSTRUCTORS
v.
Howard Lee DAVIS.
2080547.
Court of Civil Appeals of Alabama.
March 19, 2010.
Dennis Riley of Morring, Schrimsher & Riley, Huntsville, for appellant.
Steven D. Tipler, Birmingham, for appellee.
MOORE, Judge.
G.UB.MK Constructors ("the employer") appeals from a judgment awarding Howard Lee Davis ("the employee") permanent-total-disability benefits pursuant to Ala.Code 1975, § 25-5-57(a)(4)d., a part of the Alabama Workers' Compensation Act ("the Act"), Ala.Code 1975, § 25-5-1 et seq. We reverse and remand.

*1278 Background

On November 16, 2007, the employee sued the employer seeking workers' compensation benefits on account of an injury to his left hand that occurred on March 15, 2006. At trial on October 6, 2008, the parties stipulated that the employee's injury resulted from an accident arising out of and in the course of his employment with the employer, leaving the trial court to decide (1) whether the employee's compensation should be based on a scheduled injury under the Act or on a disability to the body as a whole and (2) the extent of impairment or disability resulting from the injury.
The evidence presented during the trial established the following. On March 15, 2006, the employee sustained an "avulsion injury"[1] to the top of his left hand when a mill machine the employee was repairing unexpectedly activated, catching the glove covering that hand. The machine tore the glove, the skin, blood vessels, and nerves from the top of the employee's hand. Following the accident, the employee was transported by helicopter to a trauma center. After being stabilized, the employee was sent home that evening, and, on the following day, Dr. Joseph Clark, an orthopedic surgeon, performed surgery on the employee's hand. The employee spent one night in the hospital before being released.
According to the employee, he immediately returned to the worksite, but he did not work until five or six weeks later when he started using his right hand to assemble parts in the employer's "QA" department.[2] The employee admitted that he never "lost a check" as a result of his injury. According to Dr. Clark's medical records, which were admitted into evidence, by March 23, 2006, the employee had been released to return to work "if there was sedentary/one-handed work available." On April 27, 2006, Dr. Clark noted that the employee was "doing pretty well. He still has some stiffness that we would like to work on in therapy.... I am very pleased with how this is going. We will go ahead and let him continue with therapy and one-handed work."
In June 2006, Dr. Clark noted that the employee
"is actually doing pretty well. His wounds look good. His skin graft is a good take. He has excellent motion of his hand. He reports still some pain at times.... He can do some light duty work with that [left] hand, with limited use and we will see him back in our office in six weeks, at which time I think he will be at maximum medical improvement."
Dr. Clark noted in July 2006 that the employee "still reports pain and some stiffness of his hand. I discussed with him that basically we have done all that can be done from a medical standpoint. I think his hand will have some impairment with regards to this injury." On July 17, 2006, Dr. Clark referred the employee for a functional-capacity evaluation ("FCE") and an impairment rating.
Dr. Keith Anderson performed the FCE on August 21, 2006. As part of the FCE, the employee marked a pain diagram indicating that he felt a "dull ache" in his left *1279 hand and wrist; although given the opportunity to do so, he did not indicate any other types of pain or any other areas of the body in which he felt pain. During the physical portions of the FCE, the employee performed weighted floor lifts, arm lifts, and pushes and pulls involving his arms and torso. According to Dr. Anderson's notes on the FCE, the employee complained during the performance of those physical movements of pain, stiffness, and swelling in his left hand and wrist, but he did not, however, complain of pain in any other part of his body. According to Dr. Anderson's deposition testimony, which was admitted into evidence, the employee did not indicate to Dr. Anderson that the injury had affected or impaired the employee's ability to use any other part of his body. In Dr. Anderson's opinion, at the time of the FCE, the injury to the employee's left hand did not affect any other part of the employee's body and did not impair to any extent the employee's ability to use any other part of his body.
Dr. Anderson testified that he classified the employee's injury as "Class I for Impairment for Skin Disorders" because the employee had suffered no fractures or broken bones and he was using his left hand. Dr. Anderson estimated that the employee had sustained a 5% impairment of the upper extremity and a 5% impairment of the left hand, based on his original assessment following the FCE that the employee's injury had resulted in a "3% impairment of the whole person." Dr. Anderson also established various work restrictions for the employee consistent with the FCE results. Dr. Clark subsequently adopted the 3% impairment rating and the work restrictions as established by Dr. Anderson; Dr. Clark then concluded, on August 31, 2006, that the employee had reached maximum medical improvement. Davis returned to Dr. Clark's office in November 2006 complaining of continued left-hand pain. Dr. Clark prescribed pain medication to the employee on that occasion and advised the employee that he would have to live with a certain amount of pain as a result of his hand injury.
The employee testified that, in September 2007, he returned to work as a machinist. According to the employee, he could not perform the physical duties required for that position. The employer "laid off" the employee in November 2007; the employer recalled him to work in January 2008, but he worked only four days. At the time of the trial, the employee had not worked since January 2008.
The employee returned to Dr. Clark on July 31, 2008, complaining of left-hand pain that interfered with his activities. Dr. Clark's records indicate: "I discussed with [the employee] that I really don't have much else to offer him as far as his hand goes. He may have some pain with that. As far as his work status we would let him work if it is available. We will see him back here in the office on [an as needed] basis."
At trial, the employee testified:
"When I use my left hand it hurts, makes my shoulder hurt, my arms hurt, my neck. And when I get hottrying to push the blood where these blood veins are gone, it makes my heart race. Works my heart, excessive heart, when I really have to exert myself using my left hand. And I have used it so long that my right hand has got to where it hurts real bad. When I use itI try toI use it a very good bit, then it hurts. It hurts all up in my shoulders, my arms, my neck."
The employee also added that, if it was hot and he exerted himself,
"[t]he blood veins in my hand swell up, looks like they are going to burst. My hand just throbs. It just throbs all the *1280 way up my arm and shoulder. My hand trying to push that blood and my heart rate gets to racing very hard from pressure. And I can sit down and just relax and then my heart rate will come back down. It is very painful to work with this hand when it is hot weather or any other time. When it is cold, it just aches. If I get cold it just aches all the way up my arm and my shoulder, sir.... It hurts up the back of my neck too, right up through there. Just hurts. It is painful."
On December 2, 2008, the trial court entered its judgment, concluding that
"[the employee's] hand injury resulted directly from the March 15, 2006, on-the-job accident and the injury extends to the body as a whole because [the employee] experiences severe pain which extends up his arm and into his shoulder, neck and upper back and this effects his ability to do the work required of a machinist. Additionally, [the employee] has never performed any work other than as a machinist and this is the only trade he knows. Further, the Court finds that at the age of 60, he is too old to be retrained to perform work a person could do with one hand. This Court finds that [the employee] suffers debilitating pain which serves as one of the bases for compensating him outside the schedule for an injury to the hand or extremity. [The employee's] debilitating pain, along with the effect of the injury to his hand on his shoulder and neck, together justify or serve as the basis for compensating outside the schedule. See Ex parte Tommie L. Jackson, 997 So.2d 1038 (Ala.[2008]) and Boise Cascade Corporation v. Jackson, 997 So.2d 1042 (Ala.Civ. App.[2008])."
On December 18, 2008, the employer filed a motion to alter, amend, or vacate the judgment, pursuant to Rule 59(e), Ala. R. Civ. P., asserting that the employee's injury should have been compensated as a scheduled injury under the Act and not as an injury to the body as a whole. The trial court denied that motion on March 2, 2009. The employer timely filed its notice of appeal. On appeal, the employer again challenges the trial court's finding that the employee's left-hand injury constitutes an injury to the body as a whole.

Standard of Review
In Jackson Landscaping, Inc. v. Hooks, 844 So.2d 1267, 1268 (Ala.Civ.App.2002), this court stated the standard of review applicable to an appeal from an award of workers' compensation benefits:
"This case is governed by the 1992 Workers' Compensation Act. This Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala.Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court `has defined the term "substantial evidence," as it is used in § 12-21-12(d), to mean "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."' Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala. 1996), quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This court has also concluded: `The new Act did not alter the rule that this court does not weigh the evidence before the trial court.' Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995)."

*1281 Analysis

In its judgment, the trial court found that the employee "experiences severe pain which extends up his arm and into his shoulder, neck and upper back and this affects his ability to do the work required of a machinist. Additionally, .... [the employee] suffers debilitating pain which serves as one of the bases for compensating him outside the schedule for an injury to the hand or extremity." Thus, in its judgment, the trial court referred to the two recognized grounds for awarding benefits outside the schedule. We address each of those grounds separately.

Whether the Employee Was Entitled to An Award of Benefits Outside the Schedule Under the Drummond Test
In its judgment, the trial court found that the employee "experiences severe pain which extends up his arm and into his shoulder, neck and upper back and this affects his ability to do the work required of a machinist." By that language, the trial court purported to find that the employee had presented sufficient evidence to meet the test set out in Ex parte Drummond Co., 837 So.2d 831, 834 (Ala. 2002). However, that test for distinguishing scheduled and unscheduled injuries states: "`[I]f the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'" 837 So.2d at 834 (quoting 4 Lex K. Larson, Larson's Workers' Compensation Law § 87.02 (2001)). Pursuant to the Drummond test, the key consideration is not whether the effects of the injury impair the ability of the worker to work in his or her former occupation. In fact, the Drummond court specifically rejected evidence of a worker's vocational disability, even to a significant degree, as being sufficient to justify an award of benefits outside the schedule. 837 So.2d at 835-36. Thus, as phrased, the trial court's findings actually do not satisfy the Drummond test.
Assuming that the trial court intended to make a finding in compliance with Drummond, we note that
"[u]nder Alabama's workers' compensation law, the determination of whether an injury to one part of the body causes symptoms to another part of the body is a question of medical causation.... To prove medical causation, the employee must prove that the effects of a scheduled injury, in fact, contribute to the symptoms in the nonscheduled parts of the body.... Therefore, in order to decide whether the employee has satisfied the first prong of the Drummond test, we must determine whether substantial evidence supports the trial court's finding that the [scheduled] injury ... [caused pain in the nonscheduled parts]."
Boise Cascade Corp. v. Jackson, 997 So.2d 1042, 1044 (Ala.Civ.App.2008). In Hokes Bluff Welding & Fabrication v. Cox, 33 So.3d 592 (Ala.Civ.App.2008), this court recognized that
"`lay testimony may combine with medical testimony to supply th[e] requisite proof; and ... the medical testimony, when viewed in light of lay evidence, may amply support the medical causation element without the expert witness's employing any particular requisite language.'"
33 So.3d at 595 (quoting Ex parte Price, 555 So.2d 1060, 1063 (Ala.1989)). Furthermore, relying on Ex parte Southern Energy Homes, Inc., 873 So.2d 1116, 1122 (Ala. 2003), we held in Cox that, when determining on appellate review whether a worker has presented substantial evidence of medical causation,

*1282 "we must view the overall substance of the evidence, including not only the expert testimony, but also the lay and circumstantial evidence, in a light most favorable to the findings of the trial court."
33 So.3d at 596.
In this case, the employee did not present any expert medical evidence linking the symptoms in his shoulder, neck, and upper back to his left-hand injury.[3] The medical records placed into evidence, which apparently fully document the course of the employee's medical treatment, do not mention any complaints of pain or other symptoms in those areas and, accordingly, do not disclose any possible connection to the left-hand injury. Hence, the record contains no evidence of an expert nature indicating that the effects of the left-hand injury, in fact, extend to the employee's shoulder, neck, and upper back.
The circumstantial evidence also does not suggest any connection. The employee did not complain of any pain in other parts of his body during his FCE when he was asked to perform the most demanding physical activities he had undertaken since the accident. The employee testified that his QA job required relatively little physical activity. In the FCE, however, he lifted, pushed, pulled, and carried very heavy weights and participated in other strenuous activities requiring full use of his left hand, left shoulder, neck, and upper back. During that FCE, the evaluator monitored the employee's heart rate, which increased as the employee used maximal effort. During that FCE, the employee complained solely of pain in his left hand and wrist and he did not relate any unusual symptoms from a racing heartbeat. Taken together with the absence of complaints of pain in other areas of the body in the medical records, the circumstantial evidence does not suggest any causal connection between the left-hand injury and the pain the employee experiences in his shoulder, neck, and upper back.
The lay evidence at trial consisted solely of the employee's testimony, the pertinent portion of which is outlined above. In addition, when questioned by counsel for the employer at trial, the following colloquy occurred:
"Q: [B]ut there are no complaints to the orthopedic surgeons who treated you of [the symptoms in other parts of the body to which the employee testified at trial]?
"A: You read the [2008] deposition that I gave of the orthopedic surgeon just a few days ago when I was up there in July. I told him where I was hurting, he X-rayed my hand and I told Dr. Clark that my hand was hurting me and what condition I was in from trying to use my hand.
"Q: Well, the records will speak for themselves and the Court will look at them, I'm sure. What we are talking about here is this milling machine turned on unexpectedly and cut you badly on your left hand?
"A: Yes, sir.
"Q: And that was where you had your treatment and that is the only part of your body that was injured, isn't it?
"A: No, sir. It has affected the use of my arm, my shoulder hurts, and affected the use of my right hand from this injury.

*1283 "Q: Did you tell your treating doctors about that?
"A: I told him my hand was hurting real bad when I used it and when I picked up stuff it hurt. And this has just gradually gotten worser, sir, as time is going on because whenever I try to use my right hand doing anything, it hurts more because I'm trying to use my right hand more than my left hand because I know it is going to hurt if I use it. I cannot even run a garden tiller without it hurting.
"Q: I understand, but there is no complaint like that in the records of Dr. Clark?
"A: Well, I told Dr. Clark just the last visit that this was getting worser each time I used my hand. I don't know why he did not put it in the record. I don't know that, sir."
We glean from this excerpt that the employee claimed he had complained of pain outside his left hand to Dr. Clark on only 1 of his 11 visits to that physician, his last visit on July 31, 2008, but that Dr. Clark inexplicably had failed to document those complaints in his medical records, which refer solely to "severe pain about [the employee's] left hand that interferes with his activities."
In Jackson Landscaping, Inc. v. Hooks, 844 So.2d 1267, 1270-73 (Ala.Civ.App. 2002), Randy Hooks sought benefits for a lower-back injury allegedly caused by an automobile accident that occurred in the course of his employment. The medical records from the date of the accident did not mention any lower-back injury, but Hooks testified that the records contained a "`misprint.'" 844 So.2d at 1269. The first mention of pain arose 16 months after the accident, which Hooks testified was when his back "`actually started hurting.'" 844 So.2d at 1270. The medical testimony indicated that it was unlikely that the lower-back injury was related to the automobile accident. Both the owner of the defendant company and two co-employees testified that Hooks never mentioned a lower-back injury. 844 So.2d at 1271. Based on the foregoing evidence, and a review of a colloquy between the circuit court and counsel for both parties in which the circuit court indicated that it considered a complaint to the buttocks to be synonymous with a complaint of a lower-back condition, 844 So.2d at 1272-73, this court reversed the judgment finding that the automobile accident medically caused Hooks's lower-back injury. This court concluded that the record did not contain substantial evidence to support the finding of medical causation. 844 So.2d at 1271.
In Ex parte Southern Energy Homes, Inc., 873 So.2d 1116 (Ala.2003), the court reversed a judgment finding medical causation in a case in which a worker, Emma Riddle, claimed she had injured her back and had developed depression after falling off a ladder at work in April 1996. Riddle stated that she had told her treating physician of her back complaints; however, in Riddle's medical records, the physician did not mention the 1996 incident or any complaints of back pain until after Riddle had filed a claim relating to the 1996 incident in early 1997. Riddle claimed that the physician had told her that he "forgot" to document the complaints. The consensus among the medical doctors who testified in the case was that it was possible, but unlikely, that the 1996 incident caused Riddle's back pain. The psychological experts testified only that the 1996 injury possibly could have led to Riddle's depression. 873 So.2d at 1117-21. Noting the speculative and uncertain state of the medical testimony and the absence of documented complaints of back pain following the 1996 incident, the supreme court concluded that the only evidence linking Riddle's back *1284 injury and depression to the 1996 incident came from Riddle's own testimony. The court stated:
"Looking at the `overall substance' of the evidence, `viewed in the full context of all the lay and expert evidence,' [Ex parte] Price, 555 So.2d [1060] at 1063 [(Ala.1989)], Riddle's testimony alone cannot be said to constitute `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer' medical causation. West v. Founders Life Assurance Co., 547 So.2d [870] at 871 [(Ala.1989)]. This is not to say that a plaintiff's testimony alone can never constitute substantial evidence of medical causation, but rather that in this case the evidence as a whole weighs heavily against finding the plaintiff's testimony alone to be substantial evidence of medical causation."
873 So.2d at 1122.
In this case, the employee could not explain the omission of the alleged complaints to Dr. Clark any better than did Hooks or Riddle. As in Hooks, no independent witness verified the complaints made by the employee. Even assuming the employee did complain to Dr. Clark as the employee testified, those complaints did not arise until over 28 months after the initial injury to the employee's left hand and over 6 months after he last worked. The employee offered no evidence indicating that he had been experiencing the same pain when he was working and presumably using his left hand more often. The medical testimony is even stronger in this case than in Hooks and Southern Energy Homes, Inc., in which the medical experts indicated at least a possibility of a medical connection between the on-the-job accidents and the claimed injuries. In this case, Dr. Anderson definitively stated that the injury to the employee's left hand did not affect any other part of the employee's body. As in Southern Energy Homes, Inc., the only evidence supporting a finding that the effects of the left-hand injury extend to the left shoulder, neck, and upper back of the employee consists of the employee's subjective testimony. However, the evidence as a whole weighs heavily against that testimony. Hence, we conclude, consistent with Hooks and Southern Energy Homes, Inc., that the employee did not present substantial evidence of medical causation.
Even assuming that the effects of the left-hand injury extended to the employee's left shoulder, neck, and upper back, the record contains no evidence indicating that those effects hinder or impede the effective functioning of those areas of the employee's body. See Boise Cascade, 997 So.2d at 1045 ("On appeal, we review the record to determine whether the [worker] presented substantial evidence indicating that the effects of his [scheduled] injury hinders or impedes the effective function of [other parts of his body.]"). Other than complaining of pain, the employee did not indicate in any manner how his shoulder, neck, and upper back, all of which functioned without deficit during the FCE, have been hampered due to the effects of the left-hand injury.
Because the employee did not present sufficient evidence that the effects of his left-hand injury extend to other parts of his body and interfere with their efficiency, we conclude that the trial court erred in finding that the employee satisfied the Drummond test, and therefore its judgment as to this issue is due to be reversed.

Whether the Employee Was Entitled to an Award of Benefits Outside the Schedule Under the Pain Exception
As a second ground for awarding the employee benefits outside the schedule, the trial court found that "[the employee] *1285 suffers debilitating pain which serves as one of the bases for compensating him outside the schedule for an injury to the hand or extremity." At the time the judgment was entered on December 1, 2008, Masterbrand Cabinets, Inc. v. Johnson, 984 So.2d 1136 (Ala.Civ.App.2005), affirmed, Ex parte Masterbrand Cabinets, Inc., 984 So.2d 1146 (Ala.2007), served as the only possible authority allowing a trial court to treat "debilitating" pain as a way of avoiding the schedule.[4] This court has since overruled Johnson and held, consistent with footnote 11 from Ex parte Drummond, that pain isolated to a scheduled member may be sufficient to remove the injury from the schedule if that pain is totally, or virtually totally, physically disabling. See Norandal U.S.A., Inc. v. Graben, 18 So.3d 405, 416 (Ala.Civ.App.2009) ("Graben I").
As more recently discussed in Norandal U.S.A., Inc. v. Graben, [Ms. 2080679, March 12, 2010] ___ So.3d ___ (Ala.Civ. App.2009) ("Graben II"):
"This court phrased the [new `pain exception'] test as requiring proof of total, or virtually total, physical disability because Ex parte Drummond holds that an injury to a scheduled member may not be treated as unscheduled based on evidence of the vocational disability arising therefrom. 837 So.2d at 834 n. 8....
"Ex parte Drummond further instructs this court that the pain exception should be construed strictly. As this court has previously recognized, the Drummond court intended `a reining in... of the manner of computing benefits where the only impairment claimed is to a scheduled member.' Ex parte Fort James Operating Co., 905 So.2d 836, 844 (Ala.Civ.App.2004). Ex parte Drummond created a `more stringent test' for circumventing the legislated remedy. Alabama Workmen's Comp. Self-Insurers Guar. Ass'n, Inc. v. Wilson, 993 So.2d 451, 453 (Ala.Civ.App.2006). Accordingly, any judicially created exception to the schedule must be applied narrowly. See Ex parte Addison Fabricators, Inc., 989 So.2d 498 (Ala.2007). The pain exception should not be applied so that it swallows the rule of exclusivity and returns the law to its pre-Ex parte Drummond state in which the schedule almost never controlled the compensation due for an impairment to a listed member. See 1 T. Moore, Alabama Workers' Compensation § 14:16 (Supp. 2009). Just recognizing a pain exception to the schedule injects uncertainty into an area purposefully intended to be certain, see Ex parte Addison Fabricators, Inc., 989 So.2d at 502-03 (recognizing that the legislature instituted the schedule to minimize controversy and to assure speedy payment of benefits); the test should not be applied in such a manner as to add to that uncertainty and to lead to the type of litigation the legislature specifically intended to avoid when it created the schedule. See id. In keeping with Ex parte Drummond and the legislative intent behind the schedule, the test is not satisfied by evidence that the worker experiences `abnormal,' constant, and severe pain even when not using the affected member, see Johnson, 984 So.2d at 1144-45; rather, it requires competent proof that whatever pain the worker experiences completely, or almost completely, physically debilitates the worker.

*1286 "In determining whether the evidence satisfies this exceedingly high standard, a trial court must consider all legal evidence bearing on the existence, duration, intensity, and disabling effect of pain in the scheduled member, including its own observations. See generally Nance v. Nance, 640 So.2d 953 (Ala.Civ. App.1994). That evidence would include the worker's own subjective complaints, even if those complaints are unsupported by or contradict the medical evidence...."
Graben II, ___ So.3d at ___.
Based on the change in the law that occurred while this case has been on appeal, we reverse the trial court's judgment and remand the case for the trial court to reconsider its findings in light of the test set out in Graben I and Graben II. See Wehadkee Yarn Mills v. Harris, 31 So.3d 150, 159 (Ala.Civ.App.2009). On remand, the trial court is instructed to determine whether, based on the evidence in the record, the pain isolated in the left hand of the employee totally, or virtually totally, disables him.
REVERSED AND REMANDED.
THOMPSON, P.J., and THOMAS, J., concur.
PITTMAN, J., concurs specially.
BRYAN, J., concurs in part and concurs in the result, with writing.
PITTMAN, Judge, concurring specially.
I concur in the main opinion. See my special concurrence in Norandal U.S.A., Inc. v. Graben, [Ms. 2080679, March 12, 2010] ___ So.3d ___, ___ (Ala.Civ.App. 2010).
BRYAN, Judge, concurring in part and concurring in the result.
I concur in the result to reverse and remand. I concur in the second part of the opinion that deals with the award of benefits outside the schedule under the pain exception, but I do not concur in all the reasoning in the part of the opinion that deals with an award of benefits outside the schedule pursuant to the Ex parte Drummond test.
NOTES
[1] At trial, the parties explained that an "avulsion injury" means that the top part of the hand was torn away. See also Merriam-Webster's Collegiate Dictionary 86 (11th ed.2003) (defining "avulsion" to mean "a forcible separation or detachment: as ... a tearing away of a body part accidentally or surgically").
[2] Although this reference is not explained in the record, we presume that "QA" refers to quality assurance.
[3] We do not consider the evidence of the effects of the injury extending into the left arm or right hand or right arm because those effects would not take the injury outside the schedule. See Ex parte Addison Fabricators, Inc., 989 So.2d 498 (Ala.2007).
[4] In Norandal U.S.A., Inc. v. Graben, 18 So.3d 405 (Ala.Civ.App.2009), this court determined that Johnson was not controlling authority.